# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHERICK JACKSON | Case No. 17-CR-590-1<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

On September 7, 2017, the Grand Jury returned an indictment against Defendant Sherick Jackson ("Defendant"), charging him with unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(e)(1). Indictment [2].

On November 15, 2018, Defendant moved to suppress certain incriminating statements Defendant made to law enforcement officers and any subsequently derived evidence. Defendant's Motion Suppress Confession [35]. Defendant alleges that he was detained in an alley and then "removed from the scene at the direction of police, in custodial detention, and was interrogated by the police specifically as to evidence of criminality within his vehicle" prior to being properly advised of his constitutional rights. *Id.* Therefore, Defendant asserts that those statements, and his later post-*Miranda* statements, must be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Missouri v. Seibert,* 542 U.S. 600 (2004).

1

On December 13, 2018, this Court held an evidentiary hearing on Defendant's motion. At the hearing, Defendant presented evidence in support of his motion, including his own testimony, as well as that of three Chicago Police officers. The parties further introduced, without objection, electronic evidence captured by police body-cameras (Gov. Ex 1).

Subsequently, the parties filed post-hearing memorandums. In his memorandum [43], Defendant concedes that "the delineation of testimony presented" in the Government's memorandum [42] "is accurate and objectively presented as to those facts" contained therein. [43] at 1. Additionally, Defendant also states that he "does not object to the initial statements made to Sgt. Losik at the scene" because the interaction was "exigent and otherwise within the proper role of the officers pursuant to an initial *Terry* investigation." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). As such, this Court only considers the admissibility of Defendant's statements made after "his removal from the scene and transport to the hospital in handcuffs." [43] at 6.[1]

Based upon this record, including the materials submitted by the parties and the evidence presented at the hearing, this Court makes the following factual findings and draws the resulting conclusions of law.

---

[1] In his post-hearing memorandum, Defendant also abandoned a prior, undeveloped claim that Defendant failed to understand his *Miranda* warnings. [43].

**I.   Findings of Fact**

In the early morning hours of December 9, 2016, while on routine patrol in a marked police vehicle, Chicago police officers saw a car double-parked on the street at approximately 200 North Austin Boulevard. As the officers began a registration check, the car pulled away at a high rate of speed while an occupant's feet were still hanging out of the vehicle. The officers activated their emergency equipment and pursued the car as it fled northbound on Austin Boulevard.

During the ensuing car chase, the radio dispatcher relayed contemporaneous reports of prior gunfire in the officers' immediate vicinity. With the officers still in pursuit, the car raced eastbound onto Corcoran Place and then southbound into an alley before crashing into another parked car near 126 North Mayfield Avenue. The officers then observed both car doors open and the occupants exit the car, with two males and one female fleeing on foot. The officers gave chase, almost immediately caught the female, and detained her in the back of a police vehicle.

Upon inspection of the now abandoned car, the officers observed bullet holes in the car, a semi-automatic 44-caliber handgun on the floorboard of the front passenger seat, and a 45-caliber semi-automatic pistol between the front passenger door and the front passenger seat. The officers reported their observations over the radio and requested back-up officers.

As assisting officers arrived on scene, they conducted a search of the immediate area for the two males who fled from the car. One of the assisting officers, Sergeant

Thomas Losik, searched the alley east of Menard Avenue where he heard Defendant yell out for help and claim that he had been shot. Sgt, Losik responded and saw Defendant leaning against a chain link fence. Sgt. Losik observed that Defendant's hand was bleeding, but he did not see any evidence of a gunshot wound. As a safety measure, Sgt. Losik handcuffed Defendant and moved him to the curb to await an ambulance. As they waited for the ambulance to arrive, Defendant made several statements to the police officers. At this point, Sgt. Losik did not know the exact nature of Defendant's criminal involvement, if any, in the Mayfield Avenue incident under investigation.

When medical personal arrived, they transported Defendant in an ambulance to West Suburban Hospital in Oak Park, with one of his wrists possibly handcuffed to a rail. Police officers followed the ambulance in their own police vehicles. Upon instructions from Sgt. Losik, two police officers remained at the hospital and detained Defendant, so detectives could conduct a follow-up investigation.

On his way to the hospital himself, Sgt. Losik learned from other officers that the female occupant of the vehicle had given a statement to law enforcement. She stated that she had been picked up by an individual she knew only as "Black" and another unknown male. She stated that in the car Black began acting paranoid as if he was high on drugs and told them that he believed they were being followed. She stated that Black then got out of the vehicle, looked down the ally and shot a gun. She stated that she told the driver to leave Black because he was high; and, as the driver

4

began to pull away, Black jumped on top of the car, pointed guns at them and threatened to kill them if they tried to leave him. She stated that Black then opened fire, and a bullet hit the car near where she was sitting. She stated that as they pulled away Black jumped in the car with his feet still hanging out, and a law enforcement vehicle began its pursuit of their car.[2]

When he arrived at the hospital, Sgt. Losik relayed this new witness information to the officers standing guard near Defendant at the hospital. From behind a curtain ten to twelve feet away, Defendant then, unprompted, stated that he was not shooting the gun at anyone, but rather he was just shooting toward the ground. Defendant called Sgt. Losik over to his bed and said that he would tell Sgt. Losik what happened; he then admitted that he had the gun but claimed he just shot at the ground.[3] Prior to these admissions, Sgt. Losik did not know that "Black" was, in fact, Defendant.

Upon his release from the hospital, police officers formally arrested Defendant and transported him to the 15th District police station to be processed. At the station, one

---

[2] Approximately 18 hours after this interview, the female witness later identified Defendant from a photo array to be the person she knows as "Black".

[3] Based upon this Court's observations at the evidentiary hearing, the law enforcement witnesses provided credible testimony, consistent with the electronic evidence (where available); Defendant, however, often provided inconsistent and conflicting accounts of the events that lacked credibility on a variety of important points, including his false version of his statement to Sgt. Losik at the hospital. [41] at 18 ("I told them when I was walking up to the car, somebody started shooting out the car and I fell down to the ground. And when I jumped up, I hit the yard and tried to get away but no, that ain't happening."). At the hearing, however, Defendant did testify credibly that at the hospital the police officers did not ask him any questions or place him in handcuffs, and that even though he is familiar with *Miranda* warnings, they were not given to him at that time.

of the first responding police officers to the Mayfield Avenue incident, Christian Szczur, was writing police reports when Defendant arrived in handcuffs to be processed in the holding area. As part of the booking process, Officer Szczur asked Defendant his name, address, and birthdate. Then, as Officer Szczur walked back to his computer, Defendant began yelling to get his attention. Officer Szczur asked Defendant if he needed something, and Defendant told the officer that Defendant did not shoot anyone and that he was just shooting at the ground.

Later that afternoon, Detective Charles Hernandez met with Defendant at the 15th District police station. Det. Hernandez verbally advised Defendant of his rights under *Miranda.* Det. Hernandez stated each right individually and asked Defendant if he understood each right. Defendant stated that he understood his rights, waived those rights, and agreed to speak to Det. Hernandez. Defendant then gave a detailed incriminating statement to law enforcement consistent with his prior statements.

## II. Conclusions of Law

Under *Miranda v. Arizona,* 384 U.S. 436 (1966), the admissibility of a custodial statement remains conditioned upon prior warnings regarding the suspect's rights against self-incrimination. Failure by law enforcement to give the prescribed warnings and obtain a waiver of those rights before custodial questioning generally requires exclusion of any resulting statements. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). A custodial interrogation occurs when law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived of his freedom of action in

6

any significant way. *United States v. Barker,* 467 F.3d 625, 628 (7th Cir. 2006) (suspect must be both "in custody" and subjected to "interrogation" before the law requires *Miranda* warnings).

To determine whether a defendant is "in custody," this Court must examine the "totality of circumstances" and determine whether a reasonable person would have believed that he or she was free to leave. *Id.*; *United States v. Burns,* 37 F.3d 296, 280 (7th Cir. 1994). In this analysis, the relevant factors include: "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Barker,* 467 F.3d at 629; *U.S. v. Hocking,* 860 F.2d 769, 773 (7th Cir. 1988) (court considered the defendant's "freedom to leave the scene and the purpose, place and length of interrogation.").

As to the interrogation requirement, the term "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980) (interrogation includes questioning or its "functional equivalent"); *United States v. Johnson,* 680 F.3d 973, 974 (7th Cir. 2012). As such, "both the context

and the content of the officers' statements are important." *United States v. Rankins*, No. 13 CR 331, 2014 WL 1924017, at *7 (N.D. Ill. May 14, 2014) (citing *United States v. Henley,* 984 F.2d 1040, 1043 (9th Cir. 1993); *United States v. Martin,* 238 F.Supp.2d 714, 719 (D. Md. 2003)).

The Fifth Amendment, however, does not bar volunteered statements of any kind. *Miranda,* 384 U.S. at 478. Thus, if a defendant makes a statement in response to words or actions by officers that do not constitute interrogation, or if he initiates communications, the law does not prohibit the officers from listening to his voluntary statement. *United States v. Jones,* 600 F.3d 847, 855 (7th Cir. 2010).

### A. Admissibility of Hospital Statements

Even assuming *arguendo* that officers had placed Defendant in custody during his hospital stay (which this Court need not determine), Defendant's incriminating statements to Sgt. Losik were volunteered and lacked the requisite interrogation or its functional equivalent. Specifically, this Court finds the law enforcement testimony credible regarding the factual nature of this interaction with Defendant. Here, Defendant initiated contact with Sgt. Losik (who never questioned Defendant); and the record contains no factual support for the notion that Sgt. Losik's update of his fellow officers constituted an improper device to elicit an incriminating response from Defendant. Indeed, when Sgt. Losik gave the update, he had no idea that Defendant went by the name of Black; nor did he know what exact role Defendant played in the incident. Sgt. Losik learned these things only when Defendant told him as much. As

8

a result, this case stands in sharp contrast to the "Christian burial speech" scenario that troubled the Supreme Court in *Brewer v. Williams,* 430 U.S. 387 (1977). Defendant's volunteered statements at the hospital remain admissible.

### B. Admissibility of Holding Cell Statements

With regard to the statements Defendant made in the holding cell, the record again confirms that Defendant's incriminating statements (this time to Officer Szczur) were volunteered and lacked the requisite interrogation or its functional equivalent. Officer Szczur's simple booking questions do not constitute interrogation; nor did they improperly induce Defendant to incriminate himself. In so finding, the Court credits the officer testimony and finds that Defendant initiated the relevant contact by calling Officer Szczur over to the holding cell. At that point, Officer Szczur did not know why Defendant was summoning him. Accordingly, Defendant's unexpected and voluntary statements to Szczur are admissible.

### C. Admissibility of *Mirandized* Statements

Defendant agrees that his statements to Det. Hernandez were properly *Mirandized*. [43] at 5, 9-10. But he argues, citing *Missouri v. Siebert,* 542 U.S. 600 (2004), that this Court must nevertheless suppress them because his previous non-*Mirandized* statements tainted his subsequent admissions. In *Siebert,* the Supreme Court confronted an improper practice in which certain police departments would provide *Miranda* warnings during custodial interrogation only after the interrogation produced a confession. *Id.* at 604. As noted above, however, the evidence in this case shows that

9

Defendant's custodial interrogation did not begin until he was questioned by Det. Hernandez pursuant to proper *Miranda* warnings and waiver. Therefore, *Siebert* does not apply.[4]

### III. Conclusion

Based upon the above, the Court denies Defendant's Motion to Suppress Confession [35].

Date: June 5, 2019

ENTERED:

_____
John Robert Blakey
United States District Judge

---

[4] Four cases govern the Seventh Circuit's analysis: *Oregon v. Elstad*, 470 U.S. 298 (1985); *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion); *United States v. Stewart*, 388 F.3d 1079 (7th Cir. 2004) ("*Stewart I*"); and *United States v. Stewart*, 536 F.3d 714, 718 (7th Cir. 2008) ("*Stewart II*"). In *Elstad*, the Supreme Court held that the admissibility of a post-warning confession obtained after an earlier, unwarned inculpatory statement turns upon whether the pre- and post-warning statements were voluntary. 470 U.S. at 310-11. If the first statement remains voluntary (albeit unwarned), then the second statement need not be excluded if it is otherwise properly Mirandized and voluntary. *Id.* at 318. Such is the case here. Furthermore, in *Stewart I*, the Seventh Circuit reconciled *Seibert*'s plurality and concurring opinions, and held that in cases *not* involving the deliberate use of a two-step interrogation, such as this case, *Elstad*'s central voluntariness inquiry stands. 388 F.3d at 1090.